IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CYTOKINETICS, INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>BRISTOL-MYERS SQUIBB COMPANY and MYOKARDIA, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No.<br><br>**JURY TRIAL DEMANDED** |

**CYTOKINETICS' COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff Cytokinetics, Incorporated ("Plaintiff" or "Cytokinetics"), by and through its undersigned counsel, files this Complaint against Defendants Bristol-Myers Squibb Company ("BMS") and MyoKardia, Inc. ("MyoKardia") (collectively "Defendants") seeking declaratory relief with respect to U.S. Patent No. 12,616,697 (the "'697 patent") (attached as Exhibit A). In support of this Complaint, Cytokinetics alleges as follows:

**INTRODUCTION**

1. This case concerns Defendants' attempt to use the patent system to do something they cannot in the clinic or the marketplace: compete with Cytokinetics' groundbreaking therapy for the treatment of hypertrophic cardiomyopathy ("HCM"), MYQORZO®. To execute its scheme, Defendants have sought, and surprisingly obtained, a patent that covers certain methods of treating HCM using aficamten, the active ingredient in MYQORZO®, despite having zero involvement with aficamten's discovery, development, or commercialization, and no right to make or sell it.

2. Cytokinetics is a small pharmaceutical company that pioneered the science of modulating "myosin," the protein that drives contraction in muscles. Since its founding in 1998,

Cytokinetics has been dedicated to discovering and developing compounds that modulate muscle contractility for use in the treatment of muscle-related diseases. Relevant here, Cytokinetics was the first to discover and develop compounds that inhibit cardiac myosin, laying the scientific foundation for a new class of therapies designed to treat HCM.

3. HCM is a serious genetic heart disease characterized by abnormal thickening of heart muscle, which can lead to heart failure and sudden cardiac death. The disease is caused by mutations in proteins that make up the heart's contractile machinery, resulting in excessive muscle contractility. Until recently, treatment options for patients with HCM were limited. Physicians frequently prescribed drugs with limited evidence of effectiveness in HCM, such as β blockers or drugs approved for other heart conditions. The only FDA-approved therapy for HCM was propranolol, a β blocker approved many decades ago based on an uncontrolled study in a small number of patients. Although β blockers were thought to manage certain symptoms of HCM, they were never validated for that purpose in large clinical trials.

4. Cytokinetics' aficamten is a cardiac myosin inhibitor designed to address the underlying cause of HCM by reducing excessive heart contractility. After it spent many years developing aficamten, Cytokinetics obtained FDA approval for MYQORZO® in December 2025 for the treatment of obstructive HCM ("oHCM"), a specific type of HCM. Although it was not the first FDA-approved cardiac myosin inhibitor, MYQORZO® has demonstrated substantial efficacy in treating oHCM and an unmatched safety profile across a series of clinical trials involving hundreds of oHCM patients. Patients treated with MYQORZO® have experienced substantial improvements in exercise capacity, symptoms, and cardiac health. Moreover, MYQORZO® offers a straightforward and flexible dosing regimen, no requirement for drug-drug interaction monitoring, and a predictable safety profile. As a result, industry observers have touted

MYQORZO® as "a more attractive option for doctors"[1] and a potential "best-in-class" therapy.[2]

5. In 2012, before beginning development of aficamten, Cytokinetics helped launch and incubate a new company called MyoKardia. Through licenses, scientific collaboration, and the transfer of proprietary compounds and expertise, Cytokinetics provided MyoKardia with the foundation necessary to discover and develop mavacamten, the active ingredient in CAMZYOS®, the only other FDA-approved cardiac myosin inhibitor for the treatment of HCM. With the substantial head start provided by Cytokinetics, Defendants obtained FDA approval for CAMZYOS® before Cytokinetics secured approval of MYQORZO®. But CAMZYOS® has complicated dosing, a long pharmacokinetic half-life leading to slow onset and reversal of its effect, known drug-drug interactions, and restrictive monitoring requirements that complicate treatment for patients and physicians.[3]

6. In 2020, despite those well-known issues, Defendant BMS paid approximately $13.1 billion to acquire Defendant MyoKardia and the rights to mavacamten. In doing so, BMS followed a familiar big pharma industry playbook: acquiring an innovative therapy developed by a smaller pharmaceutical company rather than undertaking the substantial risk and investment required to discover and develop competing products of its own. But, apparently, participation in the market for HCM treatments was not enough for Defendant BMS.

7. Around the time of the acquisition, Defendants filed U.S. Patent Application

---

[1] Elaine Chen, *Late-Stage Results Set Up Cytokinetics Heart Drug to Compete with Bristol*, STAT (May 13, 2024), https://www.statnews.com/2024/05/13/cytokinetics-aficamten-heart-disease/.

[2] Jessica Merrill, *Cytokinetics' Aficamten Data Could Be Best in Class, Cardiologists Say*, Scrip (May 13, 2024), https://insights.citeline.com/SC150249/Cytokinetics-Aficamten-Data-Could-Be-Best-In-Class-Cardiologists-Say/.

[3] Bryton J. Davis et al., *Safety and Efficacy of Mavacamten and Aficamten in Patients with Hypertrophic Cardiomyopathy*, 14 J. Am. Heart Assoc. e038758 (2025), https://www.ahajournals.org/doi/10.1161/JAHA.124.038758.

18/042,632 (the "'632 Application") claiming to have invented methods of treating HCM by administering a myosin inhibitor while eliminating or reducing the amount of β blockers administered, then the standard of care treatment. Defendants sought patent protection not only for methods of using mavacamten, the drug they acquired through the MyoKardia transaction, but for ***any*** myosin inhibitor. Yet, the application disclosed data only for mavacamten and one closely related analog also owned by Defendants. Even worse, the patent application identified aficamten as a myosin inhibitor that could be used in the disclosed treatment methods despite Defendants having nothing to do with its discovery, development, or commercialization.

8. At the time of its filing and for years afterwards, the '632 Application did not expressly claim methods of treating HCM with aficamten. But that all changed after Cytokinetics publicly disclosed clinical results demonstrating aficamten's best-in-class potential, and FDA approval of MYQORZO® became imminent. Desperate to defend their $13.1 billion investment in mavacamten, Defendants turned to the patent system, not to protect innovation, as is typically the case, but to try to squash it.

9. In November 2025, just one month before the FDA approved MYQORZO®, Defendants amended the '632 Application to specifically claim methods of treatment using aficamten. Shortly after, the '632 Application issued as the '697 Patent. Because Defendants cannot lawfully practice or market the aficamten-based methods of treatment, this patenting activity has only one purpose—to enforce the patent against Cytokinetics in an attempt to burden Cytokinetics with litigation, hinder MYQORZO®'s market uptake, and profit on innovations Defendants had nothing to do with.

10. This case seeks to prevent Defendants from wielding the patent system as a weapon to undermine innovation and to unfairly compete against Cytokinetics' MYQORZO®.

## NATURE OF THE ACTION

11. This is a civil action for declaratory judgment of non-infringement and invalidity of U.S. Patent No. 12,616,697, arising under the patent laws of the United States, 35 U.S.C. § 1 et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## PARTIES

12. Cytokinetics is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 350 Oyster Point Blvd., San Francisco, CA 94080. From its founding over 25 years ago, Cytokinetics' mission has been to develop myosin activators and myosin inhibitors for the treatment of debilitating diseases stemming from compromised or declining muscle performance. Since 2015, Cytokinetics has worked to discover and develop aficamten, a potentially best-in-class myosin inhibitor for the treatment of oHCM.

13. On information and belief, BMS is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at Route 206 and Province Line Road, Princeton, New Jersey 08543. On information and belief, Defendant BMS has the exclusive right to market and sell CAMZYOS® and has the exclusive right to enforce the '697 Patent.

14. On information and belief, MyoKardia is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 1000 Sierra Point Parkway, Brisbane, CA 94005. On information and belief, MyoKardia is a wholly owned subsidiary of BMS and is the assignee and owner of the '697 Patent.

## JURISDICTION AND VENUE

15. This action arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq.

16. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1338(a), and 2201, based on an actual controversy between Cytokinetics and Defendants for declaratory judgment of non-infringement and invalidity of the '697 Patent under 28 U.S.C.§§

2201-2202.

17. This Court has personal jurisdiction over Defendant BMS because it is a corporation organized under the laws of the State of Delaware and maintains a registered agent in this judicial district.

18. This Court has personal jurisdiction over Defendant MyoKardia because it is a corporation organized under the laws of the State of Delaware and maintains a registered agent in this judicial district.

19. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c) because, on information and belief, Defendants are both corporations organized and existing under the laws of the State of Delaware and thus reside in this judicial district under 28 U.S.C. § 1391(b)(1).

20. Venue is also proper under 28 U.S.C. § 1391(b)(2) because, on information and belief, Defendants are qualified to do business in Delaware; directly or indirectly market CAMZYOS® in Delaware and to Delaware residents; distribute and sell CAMZYOS® in Delaware and to Delaware residents; and enjoy substantial income from sales of CAMZYOS® in Delaware and to Delaware residents. Similarly, Cytokinetics conducts business in Delaware; markets MYQORZO® in Delaware and to Delaware residents; intends to distribute and sell MYQORZO® in Delaware and to Delaware residents; and will earn income from sales of MYQORZO® in Delaware and to Delaware residents.

## FACTUAL ALLEGATIONS RELEVANT TO ALL COUNTS AND THE EXISTENCE OF A CASE OR CONTROVERSY

### A. Hypertrophic Cardiomyopathy

21. HCM is a serious, hereditary cardiac disease characterized by abnormal thickening of the heart muscle, impaired ventricular function, and in some cases, obstruction of blood flow out of the heart. The disease can significantly limit exercise capacity, diminish quality of life, and

increase the risk of heart failure, arrhythmias, stroke, and sudden cardiac death. HCM is the most common inherited cardiovascular disorder, with well over 300,000 patients diagnosed in the U.S.,[4] and the leading cause of sudden cardiac death in young athletes.[5] Among the most prominent examples is NBA All-Star Reggie Lewis, who was expected to be "the next [Boston] Celtics great" when he suddenly went into cardiac arrest and tragically died on July 27, 1993,[6] while shooting hoops at Brandeis University during the off-season.[7] Lewis's death was later attributed to HCM.[8]

22. Even for non-athletes, HCM increases the risk of sudden death and requires ongoing medical management to reduce symptoms, maintain quality of life, and prolong survival. HCM patients are frequently advised to limit strenuous physical activity, which can further impair their overall health and well-being.

23. The mechanism of HCM is complex. In healthy cardiac muscle, muscle contraction occurs when myosin, the motor protein responsible for muscle contraction, binds to actin and generates a force that shortens (contracts) the muscle tissue. HCM results from an increased

---

[4] Michael Butzner et al., *Epidemiology of Hypertrophic Cardiomyopathy in the United States From 2016 to 2023*, 5 JACC: Adv 102552 (Feb. 2026), https://doi.org/10.1016/j.jacadv.2025.102552.

[5] Am. Heart Ass'n, *HCM in Young Adults and Student Athletes*, https://www.heart.org/en/health-topics/cardiomyopathy/what-is-cardiomyopathy-in-adults/hcm-in-young-adults-and-student-athletes (last visited Aug. 3, 2026).

[6] Jason Jones, *Jones: Remembering Reggie Lewis 30 Years After His Sudden and Tragic Death*, The Athletic (Sep. 12, 2023), https://www.nytimes.com/athletic/4722060/2023/07/27/reggie-lewis-celtics-cardiac-arrest-death-30-years/.

[7] Elliot Almond, *Celtics' Lewis Collapses on Court, Dies: Pro Basketball: Boston's Leading Scorer Had Been Warned of possible Danger Because of Heart Condition*, L.A. Times (July 28, 1993, at 12:00 PT), https://www.latimes.com/archives/la-xpm-1993-07-28-sp-17785-story.html.

[8] Several other prominent young athletes have also died from HCM, including basketball players Hank Gathers and Jason Collier, the NFL's Thomas Herrion, the Blue Jays' Joe Kennedy and the NHL's Sergei Zholtok. *See Hypertrophic Cardiomyopathy Is Leading Cause of Death in Young Athletes*, Barnes-Jewish Hosp., (Jan. 19, 2010), https://www.barnesjewish.org/Curiosus-Mag/Article/ArtMID/6756/ArticleID/517/Hypertrophic-Cardiomyopathy-is-Leading-Cause-of-Death-in-Young-Athletes.

number of active cardiac myosin heads, which leads to abnormally forceful contractions and the thickening of the heart muscle. Obstructive HCM ("oHCM") is a subtype of HCM, wherein the thickened heart muscle also restricts or blocks blood flow out of the heart.

24. Until recently, treatment options for patients with oHCM were limited, and largely directed toward managing symptoms, rather than addressing the underlying cause of the disease. Doctors generally prescribed either a β blocker or a calcium channel blocker as the first-line treatment for oHCM. Calcium channel blockers are not FDA-approved for the treatment of oHCM, and one β blocker, propranolol, was approved to treat oHCM some fifty years ago based on an uncontrolled study involving a small number of patients. Neither class of drugs has been studied in large scale, placebo-controlled clinical trials involving oHCM patients.[9] β blockers and calcium channel blockers also do not target the underlying pathophysiology of oHCM but instead are thought to manage symptoms by decreasing heart rate and improving blood flow.

**B. Cytokinetics' Development of Aficamten, a Potential Best-in-Class, Small Molecule Cardiac Myosin Inhibitor**

25. Cytokinetics is a small pharmaceutical company headquartered in South San Francisco with fewer than 1000 employees. Until December 2025, Cytokinetics was a clinical-stage company that did not have an FDA-approved drug product.

26. Cytokinetics was founded in 1998 by four pioneers in the field of cytoskeletal biology, including motor proteins such as kinesin and myosin: Dr. James Spudich, Dr. Ron Vale, Dr. Larry Goldstein, and Dr. James Sabry. Their academic research and discoveries relating to the

[9] Steve R. Ommen et al., *2024 AHA/ACC/AMSSM/HRS/PACES/SCMR Guideline for the Management of Hypertrophic Cardiomyopathy: A Report of the American Heart Association/American College of Cardiology Joint Committee on Clinical Practice Guidelines*, 83 J. Am. Coll. Cardiol. 2324, 2360-61 (2024) (stating treatment with beta blocker or calcium channel blocker had Level B or C evidence (limited or very limited population studies)), https://www.jacc.org/doi/10.1016/j.jacc.2024.02.014.

underlying biology of motor proteins and muscle contraction formed the scientific platform for the company. From its early years, Cytokinetics pursued therapeutic programs in muscle-related cardiovascular disease and, since 2008, focused solely on diseases resulting from muscle disorders.

27. Cytokinetics proceeded to build a robust pipeline of small molecules that could either activate or inhibit cardiac myosin. Cardiac myosin inhibitors interfere with myosin's ability to bind to actin and thereby decrease the contractile force generated by the heart. Cardiac myosin activators, on the other hand, increase myosin-actin binding to increase the force of the heart's contraction. Cytokinetics discovered and characterized many small molecule inhibitors of cardiac myosin but did not initially pursue them for HCM given its limited resources, instead focusing on developing cardiac muscle activators for conditions such as heart failure.

28. In August 2012, Cytokinetics agreed to "incubate" Defendant MyoKardia, then a newly formed company interested in developing cardiac myosin inhibitors.[10] As part of the incubation, Cytokinetics licensed several of its existing cardiac myosin inhibitors to Defendant MyoKardia and also agreed to provide facilities, equipment, personnel and know-how as part of a collaboration to discover and develop additional cardiac myosin inhibitors. In return, Cytokinetics received research funding, milestones, and royalties on potential future medicines derived from the licensed cardiac myosin inhibitors. By September 2012, Defendant MyoKardia was "up and running in space leased from Cytokinetics," and just months later, the collaboration produced the compound mavacamten.[11] Defendant MyoKardia went on to clinically develop mavacamten for the treatment of oHCM.

---

[10] James A. Spudich, *From Amoeboid Myosin to Unique Targeted Medicines for a Genetic Cardiac Disease*, 15 Front. Physiol. 1496569, at 10 (Oct. 28, 2024), https://pmc.ncbi.nlm.nih.gov/articles/PMC11550953/.

[11] *Id.*

29. After the collaboration with MyoKardia concluded, Cytokinetics recognized the opportunity to develop a superior cardiac myosin inhibitor based on emerging clinical data. As became evident during its clinical development, mavacamten required complicated dosing, had a long pharmacokinetic half-life leading to slow onset and reversal of its effect, and had potential drug-drug interactions that would further complicate its use by patients and physicians. Cytokinetics thus undertook an extensive discovery program focused on compounds structurally different from mavacamten that targeted a binding site on the myosin protein distinct from mavacamten's binding site. That program ultimately resulted in aficamten, which proved to have improved pharmacokinetic properties, leading to rapid onset and offset of effect and minimal potential for clinically meaningful drug-drug interactions.

30. In 2018, Cytokinetics began human clinical trials for aficamten, which ultimately took more than seven years and an investment of well over half a billion dollars. By 2021, the early clinical trial results were so promising that the FDA awarded aficamten Breakthrough Therapy Designation for the treatment of symptomatic oHCM, signaling the agency's view that aficamten demonstrated substantial improvement over then-available therapies, such as β blockers[12]

31. Aficamten ultimately demonstrated impressive efficacy and safety. For example, treatment with aficamten resulted in improved peak oxygen uptake, a measure of exercise

[12] Press Release, Cytokinetics, Inc., Cytokinetics Announces Receipt of Breakthrough Therapy Designation from FDA for Aficamten (Dec. 9, 2021), https://ir.cytokinetics.com/press-releases/press-release-details/2021/Cytokinetics-Announces-Receipt-of-Breakthrough-Therapy-Designation-from-FDA-for-Aficamten-12-09-2021/default.aspx.

capacity[13] correlated with reduction in the risk for all-cause and cardiovascular mortality.[14] Clinical trial results also demonstrated a favorable and predictable safety profile. Unlike mavacamten, aficamten was not associated with adverse events requiring interruption of treatment and did not result in cases of heart failure or stress cardiomyopathy during the relevant studies.[15] Aficamten also has a straightforward, flexible dosing regimen and no requirement for drug-drug interaction monitoring.[16]

32. Based on the strong clinical results, Cytokinetics submitted a New Drug Application for aficamten to the FDA in late 2024.[17] On December 19, 2025, the FDA approved MYQORZO® for the treatment of adults with symptomatic oHCM.[18]

33. In addition to being the only company approved to sell aficamten, Cytokinetics has the exclusive patent rights to the compound. Cytokinetics has been granted patents covering the

---

[13] M.S. Maron et al., *Aficamten for Symptomatic Obstructive Hypertrophic Cardiomyopathy*, 390 N. Engl. J. Med. 1849, 1849-61 (2024), https://www.nejm.org/doi/full/10.1056/NEJMoa2401424; Davis et al., *supra* note 3 (mavacamten had 1.4mL/kg/min improvement in peak oxygen uptake, whereas aficamten had 1.8mL/kg/min).

[14] Caroline J. Coats et al., *Cardiopulmonary Exercise Testing and Prognosis in Hypertrophic Cardiomyopathy*, 8 Circ. Heart Fail. 1022 (2015), https://doi.org/10.1161/CIRCHEARTFAILURE.114.002248.

[15] Davis et al., *supra* note 3.

[16] *Id.*; *see also* Press Release, Cytokinetics, Inc., Cytokinetics Announces FDA Approval of MYQORZO™ (aficamten) for the Treatment of Adults with Symptomatic Obstructive Hypertrophic Cardiomyopathy to Improve Functional Capacity and Symptoms (Dec. 19, 2025), https://ir.cytokinetics.com/press-releases/press-release-details/2025/Cytokinetics-Announces-FDA-Approval-of-MYQORZO-aficamten-for-the-Treatment-of-Adults-with-Symptomatic-Obstructive-Hypertrophic-Cardiomyopathy-to-Improve-Functional-Capacity-and-Symptoms/default.aspx ("I'm pleased that the approved label and REMS reflect the distinct characteristics of MYQORZO including a straightforward, flexible dosing regimen, no requirement for drug-drug interaction monitoring and a predictable safety profile.").

[17] Press Release, Cytokinetics, Inc., Cytokinetics Highlights Progress in Cardiac Myosin Modulation Programs and Global Commercial Launch Readiness at Investor & Analyst Day (Oct. 16, 2024), https://ir.cytokinetics.com/press-releases/press-release-details/2024/Cytokinetics-Highlights-Progress-in-Cardiac-Myosin-Modulation-Programs-and-Global-Commercial-Launch-Readiness-at-Investor-Analyst-Day-10-16-2024/default.aspx.

[18] Cytokinetics, Inc., *supra* note 16.

aficamten composition of matter and methods of treating HCM using it, including U.S. Patent Nos. 10,836,755 and 12,370,179. The FDA's Orange Book lists those patents as covering MYQORZO® and indicates that they currently do not expire until 2039 and 2042, respectively.

### C. BMS Buys MyoKardia for $13.1B and then Attempts to Patent Methods of Treatment with Cytokinetics' Aficamten

34. Unlike Cytokinetics, Defendant BMS is a global biopharmaceutical company with tens of thousands of employees and nearly $50 billion in annual revenue. Defendant BMS often acquires or licenses biopharmaceutical products from start-ups and smaller biotechnology firms in order to manufacture, develop, and profit from them.

35. In 2020, Defendant BMS acquired Defendant MyoKardia for $13.1 billion,[19] gaining the rights to mavacamten. Prior to the acquisition, Defendant BMS had not publicly announced any effort to discover or develop cardiac myosin inhibitors for the treatment of HCM.

36. Around the time of the acquisition, Cytokinetics began a Phase 2 clinical trial of aficamten.[20] On information and belief, Defendants became concerned that aficamten would jeopardize financial returns on Defendant BMS's $13.1 billion investment to acquire mavacamten and decided to try to obtain patents covering methods of treatment using Cytokinetics' aficamten.

37. On August 28, 2020, and in the midst of being acquired by Defendant BMS, Defendant MyoKardia filed U.S. Provisional Patent Application No. 63/072094, entitled "Methods of Treatment" (the "'094 Provisional"). The following year, on August 26, 2021, Defendant MyoKardia filed the '632 Application, a non-provisional application claiming priority to the '094

---

[19] Press Release, Bristol Myers Squibb, Bristol Myers Squibb to Acquire MyoKardia for $13.1 Billion in Cash (Oct. 5, 2020), https://news.bms.com/news/details/2020/Bristol-Myers-Squibb-to-Acquire-MyoKardia-for-13.1-Billion-in-Cash/default.aspx.

[20] Press Release, Cytokinetics, Inc., Cytokinetics Announces Start of REDWOOD-HCM, a Phase 2 Clinical Trial of CK-3773274 (Jan. 6, 2020), https://ir.cytokinetics.com/press-releases/press-release-details/2020/Cytokinetics-Announces-Start-of-REDWOOD-HCM-a-Phase-2-Clinical-Trial-of-CK-3773274-01-06-2020/default.aspx.

Provisional.

38. The ’632 Application purported to disclose methods of treatment comprising “administering a therapeutically effective amount of a myosin modulator . . . to a subject in need thereof . . . in the absence of beta blocker therapy or with reduced beta blocker therapy.”[21] Although it contained data only for mavacamten (and one of its analogs), the ’632 Application broadly claimed methods of treating patients using ***any*** myosin inhibitor wherein patients “discontinu[e] the β blocker therapy or reduc[e] the amount of β blocker therapy.”[22]

39. Even worse, despite having no involvement in the discovery, development, or commercialization of aficamten or MYQORZO®, MyoKardia expressly identified aficamten in the ’632 Application as a “myosin inhibitor” that could supposedly be used in the claimed invention. But the ’632 Application contained no data or other substantive information regarding aficamten—just a recitation of its chemical structure. Tellingly, as originally filed and for years after, the claims of the ’632 Application did not expressly claim methods of treatment using aficamten.

40. After the MyoKardia acquisition, Defendants submitted the New Drug Application for mavacamten and subsequently received FDA approval for CAMZYOS® in 2022.

41. Meanwhile, Cytokinetics’ aficamten continued to achieve one clinical and regulatory milestone after another, all of which were publicly disclosed and known to Defendants. In 2021, the FDA granted Breakthrough Therapy Designation to aficamten for the treatment of oHCM.[23] By early 2022, aficamten had progressed through Phase 2 trials with positive data demonstrating its efficacy and safety.[24] In December 2023, Cytokinetics released topline Phase 3

---

[21] U.S. Patent Application No. 18/042,632.
[22] *Id.* at cl. 39.
[23] Cytokinetics, Inc., *supra* note 12.
[24] Press Release, Cytokinetics, Inc., Cytokinetics Announces Positive Topline Results from Cohort 3 of REDWOOD-HCM (Feb. 1, 2022), https://ir.cytokinetics.com/press-releases/press-

results,[25] and in May 2024 the full Phase 3 results,[26] demonstrating treatment with aficamten significantly improved the primary endpoint of exercise capacity and all 10 secondary endpoints.[27] The data prompted competitive comparisons between aficamten and CAMZYOS, with observers noting that aficamten may have advantages over CAMZYOS and had the potential to emerge as best-in-class.[28] A year later, in December 2024, the FDA accepted Cytokinetics' New Drug Application for aficamten for treatment of oHCM.[29] And on December 19, 2025, the FDA approved MYQORZO® for the treatment of adults with oHCM, marking the culmination of many years of work and over half a billion dollars[30] of Cytokinetics investment in the discovery and development of aficamten.[31]

42. In September 2025, ahead of the FDA approval of MYQORZO®, Cytokinetics published results from a second Phase 3 clinical trial of aficamten showing it was superior to the

release-details/2022/Cytokinetics-Announces-Positive-Topline-Results-from-Cohort-3-of-REDWOOD-HCM-02-01-2022/default.aspx.

[25] Press Release, Cytokinetics, Inc., Cytokinetics Announces Positive Results from SEQUOIA-HCM, the Pivotal Phase 3 Clinical Trial of Aficamten in Patients with Obstructive Hypertrophic Cardiomyopathy (Dec. 27, 2023), https://ir.cytokinetics.com/press-releases/press-release-details/2023/Cytokinetics-Announces-Positive-Results-From-SEQUOIA-HCM-the-Pivotal-Phase-3-Clinical-Trial-of-Aficamten-in-Patients-With-Obstructive-Hypertrophic-Cardiomyopathy-12-27-2023/default.aspx.

[26] The primary results of the SEQUOIA-HCM trial, which evaluated aficamten in patients with symptomatic obstructive hypertrophic cardiomyopathy, were published in the New England Journal of Medicine on May 13, 2024. *See* Maron, *supra* note 13. The study was simultaneously presented at the European Society of Cardiology (ESC) Heart Failure 2024 Congress.

[27] Cytokinetics, Inc., *supra* note 24.

[28] Merrill, *supra* note 2; Chen, *supra* note 1.

[29] Press Release, Cytokinetics, Inc., Cytokinetics Announces FDA Acceptance of New Drug Application for Aficamten for the Treatment of Obstructive Hypertrophic Cardiomyopathy (Dec. 2, 2024), https://ir.cytokinetics.com/press-releases/press-release-details/2024/Cytokinetics-Announces-FDA-Acceptance-of-New-Drug-Application-for-Aficamten-for-the-Treatment-of-Obstructive-Hypertrophic-Cardiomyopathy-12-02-2024/default.aspx.

[30] *See, e.g.,* Cytokinetics, Inc., Annual Report (Form 10-K) for Fiscal Year 2025 at 54 (filed Feb. 26, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001061983/000119312526076495/cytk-20251231.htm.

[31] Cytokinetics, Inc., *supra* note 16.

β blocker metoprolol at improving exercise capacity and decreasing symptoms in patients with oHCM.[32] Once again, the results prompted industry observers to characterize aficamten as a potential best-in-class therapy.[33]

43. After Cytokinetics published these clinical results, and as MYQORZO® neared FDA approval, Defendants abruptly changed their patenting strategy. On November 12, 2025, Defendants suddenly acquiesced to the Examiner's rejection of most of the pending claims of the '632 Patent Application and amended the remaining claims to specifically recite aficamten for the very first time. The Patent Office examiner subsequently allowed these claims without comment. Defendants failed to tell the patent examiner that they had played no role in the discovery, development, or clinical evaluation of aficamten.

44. The '697 Patent issued on May 5, 2026. (*See* Exhibit A.) Claim 1 of the '697 Patent claims "[a] method of treating a patient having cardiac hypercontractility, impaired cardiac relaxation and/or left ventricular hypertrophy, wherein the patient is undergoing β blocker therapy, the method comprising: discontinuing the β blocker therapy or reducing the amount of β blocker therapy; and administering to the patient a therapeutically effective amount of a myosin inhibitor; wherein the patient achieves an improvement in $pVO_2$ of at least about 2.2 mL/kg/min." (*Id*. at cl.

[32] The primary results of the MAPLE-HCM trial, which evaluated aficamten as monotherapy compared to the β blocker metoprolol as monotherapy in patients with symptomatic obstructive hypertrophic cardiomyopathy, were published in the New England Journal of Medicine on August 30, 2025. *See* Pablo Garcia-Pavia et al., *Aficamten or Metoprolol Monotherapy for Obstructive Hypertrophic Cardiomyopathy*, 393 N. Engl. J. Med. 949 (2025), https://www.nejm.org/doi/10.1056/NEJMoa2504654. The study was simultaneously presented at the European Society of Cardiology (ESC) 2025 Congress.

[33] *Truist Reiterates Buy Rating on Cytokinetics Stock after Positive Phase 3 Data*, Investing.com (Sep. 2, 2025, at 10:23 ET), https://www.investing.com/news/analyst-ratings/truist-reiterates-buy-rating-on-cytokinetics-stock-after-positive-phase-3-data-93CH-4219728. *See also Cytokinetics Soars on Aficamten's 'Best-in-Class' Performance in Phase III Cardio Study*, Biospace (Sep. 3, 2025), https://www.biospace.com/drug-development/cytokinetics-soars-on-aficamtens-best-in-class-performance-in-phase-iii-cardio-study.

1.) Claim 8, which indirectly depends from claim 1, requires that "the myosin inhibitor is [aficamten]." (*See, e.g.*, *id.* at cls. 9, 14, 19, 24.)

45. With the '697 Patent, Defendants attempt to claim ownership over methods of treatment using a drug they did not discover, did not develop, have no data to support, and have no right to make or sell.

46. Meanwhile, MYQORZO®'s best-in-class potential has begun to materialize in the marketplace. In its second full fiscal quarter on the market, more than 40% of new oHCM patients were prescribed MYQORZO®, and Cytokinetics expects that percentage to climb above 50% before the end of 2026.

**D. Additional Facts Related to the Existence of a Case or Controversy**

47. On information and belief, Defendant MyoKardia is the assignee and owner of the '697 Patent.

48. On information and belief, Defendant BMS has the exclusive right to practice and enforce the '697 Patent through its acquisition of MyoKardia and/or as demonstrated through BMS's development, marketing, and sale of CAMZYOS®.

49. Defendant BMS is extremely litigious when it comes to patent litigation. In this district alone, Defendant BMS has been involved in over 50 patent infringement cases since 2006. Defendant BMS also has a pattern of weaponizing the patent system to attack competitors' branded drug products. For example, BMS brought patent actions against Merck and AstraZeneca over their respective PD-1 antibody cancer treatments and waged an aggressive campaign against Gilead Sciences over Gilead's pioneering CAR-T therapy for lymphoma. While the disputes with Merck and AstraZeneca ultimately settled, BMS's campaign against Gilead failed when the Federal Circuit invalidated BMS's patent, holding that the specification lacked sufficient written description to support the breadth of the claims.

50. Defendants do not have the right to make or sell MYQORZO®, which has already been approved by the FDA and is exclusively commercialized by Cytokinetics. Because Defendants cannot make or sell MYQORZO®, there is only one reason why Defendants would specifically claim aficamten in the ’697 Patent: to subject Cytokinetics to the threat of costly patent litigation, impede MYQORZO®’s commercial adoption, and extract unearned value from Cytokinetics’ innovation.

51. In an effort to confirm Defendants’ intentions with the ’697 Patent, Cytokinetics sent Defendants a letter on April 3, 2026 (“the Letter,” attached as Exhibit B). In the Letter, Cytokinetics explained that it had “come to [the company’s] attention that [Defendants] recently amended the pending claims of the ’632 Application to cover certain methods of treatment that specifically recite the use of aficamten.” The Letter further explained that “Cytokinetics . . . has the exclusive right to market a product containing aficamten in the United States” and expressed surprise that Defendants sought “patent claims [covering] methods of treatment that specifically recite aficamten” given that Defendants were “not involved with the development of aficamten or MYQORZO® and cannot legally market or sell a product containing it.” The Letter requested that Defendants confirm, no later than April 10, 2026, “whether or not [they] intend[ed] to assert [the ’697 Patent] against MYQORZO®.”

52. The Parties subsequently engaged in discussions about the ’697 Patent but were unable to reach a resolution. Defendants have not provided any assurance that they will not assert the ’697 Patent against MYQORZO®.

53. Defendants’ actions have created a case or controversy by targeting aficamten in the claims of the ’697 Patent. This threat of enforcement looms over Cytokinetics and its nascent and fragile commercial business, and will continue to loom, until Cytokinetics receives a

declaration that MYQORZO® does not infringe the ’697 Patent and/or that the ’697 Patent is invalid. The issuance of the ’697 Patent, in light of the FDA’s approval of Cytokinetics’ MYQORZO® (aficamten) and the facts discussed above, creates an actual justiciable controversy among the parties concerning non-infringement and invalidity of the ’697 Patent.

## COUNT I

### (DECLARATORY JUDGMENT OF NON-INFRINGEMENT ON U.S. PATENT NO. 12,616,697)

54. Cytokinetics repeats and incorporates Paragraphs 1-53 as if fully set forth herein.

55. A real, immediate, and justiciable controversy exists between Defendants and Cytokinetics regarding Cytokinetics’ non-infringement of ’697 Patent.

56. Cytokinetics has not infringed and is not infringing any valid claim of the ’697 Patent, willfully or otherwise, directly or indirectly, either literally or by application of the doctrine of equivalents.

57. Claim 1 of the ’697 Patent claims “A method of treating a patient having cardiac hypercontractility, impaired cardiac relaxation and/or left ventricular hypertrophy, wherein the patient is undergoing β blocker therapy, the method comprising: discontinuing the β blocker therapy or reducing the amount of β blocker therapy; and administering to the patient a therapeutically effective amount of a myosin inhibitor; wherein the patient achieves an improvement in $pVO_2$ of at least about 2.2 mL/kg/min.” (Exhibit A at cl. 1.)

58. Cytokinetics does not directly infringe claim 1 of the ’697 Patent nor any other claim of the ’697 Patent because Cytokinetics does not treat patients with MYQORZO® or administer MYQORZO® (or any other myosin inhibitor) to patients.

59. Cytokinetics does not induce infringement of claim 1 of the ’697 Patent nor any other claim of the ’697 Patent. The FDA-approved use of Cytokinetics’ MYQORZO® does not teach, instruct, encourage, or promote the methods of claim 1, nor any other claim of the ’697

Patent, at least because it does not teach, instruct, encourage, or promote administering MYQORZO® to patients already on β blocker therapy, actively discontinuing β blocker therapy or reducing the amount of the β blocker therapy, and administering MYQORZO®. The other portions of the MYQORZO® Label, the MYQORZO® Instructions, and any promotional material for MYQORZO® also do not induce, encourage, or instruct acts of direct infringement of the claimed methods nor do they evidence Cytokinetics' specific intent to induce others to infringe the '697 Patent.

60. Cytokinetics does not contribute to the infringement of claim 1 of the '697 Patent nor any other claim of the '697 Patent. As evidenced by the MYQORZO® Label, including the Indication and Clinical Studies Section, there are substantial non-infringing uses of MYQORZO®.

61. Cytokinetics is entitled to a declaratory judgment that Cytokinetics does not infringe, either directly or indirectly, and has not infringed, either directly or indirectly, any valid claim of the '697 Patent, either literally or under the doctrine of equivalents.

**COUNT II**

**(DECLARATORY JUDGMENT OF INVALIDITY ON U.S. PATENT NO. 12,616,697)**

62. Cytokinetics repeats and incorporates Paragraphs 1-61 as if fully set forth herein.

63. A real, immediate, and justiciable controversy exists between Defendants and Cytokinetics regarding the validity of the '697 Patent.

64. The claims of the '697 Patent are invalid for failure to comply with the statutory prerequisites of Title 35 of the United States Code, including without limitation, one or more of §§ 102, 103 and 112, and/or any judicially created requirements for patentability and enforceability of patent and/or in view of the defenses recognized in 35 U.S.C. § 282.

65. The claims of the '697 Patent are invalid under 35 U.S.C. § 102 as anticipated by the prior art because the claimed invention was patented, described in a printed publication, or in

public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention or the claimed invention was described in a patent or in an application for a patent published or deemed published under section 122(b), in which the patent or application names another inventor and was effectively filed before the effective filing date of the claimed invention.

66. The claims of the ’697 Patent are invalid as obvious under 35 U.S.C. §103 in view of the prior art because any differences between the claims and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the relevant art. A person having ordinary skill in the relevant art would have had reason to combine the teachings of the prior art to achieve the claimed invention and would have had a reasonable expectation of success in doing so.

67. For example, at least WO 2019/028360 A1 anticipates or renders obvious (alone or in combination with one or more references and/or the knowledge of a person of skill in the art) one or more claims of the ’697 Patent.

68. The claims of the ’697 Patent are invalid under 35 U.S.C. § 112 because the ’697 Patent does not contain a written description of the claimed invention, and of the manner and process of making and using them, in such full, clear, concise, and exact terms as to demonstrate to a person of ordinary skill in the art that the alleged inventors were in possession of the full scope of the subject matter of the claims contained therein. For example, the ’697 Patent does not sufficiently enable or describe the use of the full scope of “myosin inhibitors” in the claimed methods of treatment. Nor does the ’697 Patent sufficiently enable or describe the use of aficamten in the claimed methods of treatment.

69. The claims of the ’697 Patent are invalid under 35 U.S.C. § 112 because one or

more claims of the '697 Patent do not particularly point out and distinctly claim the subject matter that the inventors regard as the invention.

70. Cytokinetics is entitled to a judgment from this Court declaring that the claims of the '697 Patent are invalid.

## **JURY DEMAND**

Cytokinetics hereby demands a trial by jury on all triable issues.

## **PRAYER FOR RELIEF**

WHEREFORE, Cytokinetics prays for the following relief:

a. A judgment declaring that Cytokinetics does not infringe, and has not infringed, any valid claim, if any, of the '697 Patent, either directly or indirectly, literally or under the doctrine of equivalents;

b. A judgment declaring that the claims of the '697 Patent are invalid;

c. A judgment declaring that Defendants and their agents, representatives, attorneys, and those persons in active concert or participation with them who receive actual notice thereof, be preliminarily and permanently enjoined from threatening or initiating infringement litigation against Cytokinetics or any of their users, customers, dealers, suppliers, or any prospective or present users, sellers, dealers, distributors, or customers of Cytokinetics' MYQORZO® (aficamten), or charging any of them either orally or in writing with infringement of the '697 Patent.

d. An award to Cytokinetics of all of its costs in this action;

e. An order finding that this is an exceptional case, and an award to Cytokinetics of its reasonable attorneys' fees under 35 U.S.C. § 285 or otherwise; and

f. Such other and further relief that the Court may deem just and proper.

/s/ Karen E. Keller
Karen E. Keller (No. 4489)
Virginia K. Lynch (No. 7423)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
glynch@shawkeller.com
*Attorneys for Plaintiff Cytokinetics, Incorporated*

OF COUNSEL:
W. Chad Shear
Geoffrey D. Biegler
Reem Gerais
COOLEY LLP
10265 Science Center Drive
San Diego, CA 92121
(858) 490-6000

Elizabeth M. Flanagan
COOLEY LLP
30 S. 9th Street, 7th Floor
Minneapolis, MN 55402
(312) 881-6383

Monica L. Daegele
COOLEY LLP
350 S. Grand Ave, Suite 3200
Los Angeles, CA 90071
(213) 561-3250

HanByul Chang
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

Michael Francisco Young
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
202-842-7800

Dated: August 13, 2026